UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x

**VERIZON NEW YORK, INC.,**                    :

                                     :    08 Civ. _____

               Plaintiff,             :

                                       :    **Memorandum In Support of**

                v.                     :    **Plaintiff Verizon New York,**

                                       :    **Inc.'s Motion for An Order to**

**TIME WARNER CABLE, INC.,**                   :    **Show Cause on A Preliminary**

                                       :    **Injunction and For A**

              Defendant.             :    **Temporary Restraining Order**

-----------------------------------------------------x

Plaintiff Verizon New York, Inc. ("Plaintiff" or "Verizon") respectfully submits this memorandum of law in support of its Motion for An Order to Show Cause on A Preliminary Injunction and For A Temporary Restraining Order against Time Warner Cable, Inc. ("Defendant" or "Time Warner"). Verizon seeks to have Time Warner enjoined from advertising using several literally false claims about Verizon's FiOS service.

## PRELIMINARY STATEMENT

Time Warner is currently running false advertisements on the Internet and on television in the New York Designated Market Area ("DMA"), which is a 29-county geographic area comprising this District and contiguous counties in New Jersey, New York, and Connecticut, jointly covered by a group of television stations. The false advertisements consist of two commercials: a 60-second commercial (the "Satellite Dish Commercial"), which first aired on March 3, 2008, and a 30-second version of the commercial (the "30 Second Commercial"),

which began running on January 1, 2008.  The Satellite Dish Commercial also runs in continuous loop on the New York/New Jersey page of Time Warner's website.  Both commercials target Verizon's FiOS network, which offers consumers television, Internet, and telephone service via a 100% fiber-to-the-home network.

The Satellite Dish Commercial makes the false and damaging claims, including that FiOS consumers need a satellite dish to receive television service from Verizon and that Time Warner's own "triple play" bundle of television, Internet, and telephone is technologically superior to FiOS.  In addition, both commercials also make the false and damaging claim that Verizon is new to fiber-optic technology, and thus too inexperienced to be trusted by consumers with providing television, Internet, and telephone service via a 100% fiber-optic network to the home. These claims are false and misleading advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and New York state law.

Time Warner's continuing false advertising is causing Verizon immediate and irreparable harm.  Both the Satellite Dish Commercial and the 30 Second Commercial employ literally false claims to convince television, broadband Internet, and telephone customers to buy Time Warner's services instead of Verizon's.  Likewise, both commercials employ these false claims to convince existing Time Warner customers to abandon any consideration of switching to Verizon to obtain the advantages offered by its FiOS network.  The loss of

customers resulting from these false advertisements costs Verizon sales, market share, and good will that is difficult to quantify or recapture.

Of the two commercials, the Satellite Dish Commercial, which Verizon first discovered on March 31, 2008, is far more egregious. It contains at least four blatantly false claims that attack the integrity of a product in which Verizon has committed a $23 billion investment and misrepresent Verizon's ability to provide the very service that is essential to Verizon's ability to compete with Time Warner. The false claims that FiOS consumers require a satellite dish to receive television service from Verizon and that Verizon's *FiOS* TV service is unavailable in the New York DMA are especially devastating, as they strike at the heart of Verizon's ability to compete with Time Warner on the provision of the all-important "triple play" of television, Internet, and telephone services. As a result of the numerous false statements in this commercial and the drastic and irreparable harm that is inflicting on Verizon, Verizon respectfully requests the immediate entry of a temporary restraining order barring Time Warner from airing the Satellite Dish Commercial anywhere in the United States pending a hearing on a preliminary injunction.

In addition, Verizon respectfully requests that the Court issue a preliminary injunction enjoining Time Warner from disseminating anywhere in the United States either the Satellite Dish Commercial or the 30-second commercial, and from making in the future similar false and misleading statements about Verizon's products and services.

3

## FACTUAL BACKGROUND

### The Parties and Their Services

Verizon and Time Warner are direct competitors for the provision of television, Internet broadband, and telephone services in 10 of the 29 counties that comprise the New York DMA.  *See* Declaration of Susan M. Retta at ¶¶ 5, 9 (April 9, 2008) ("Retta Decl.") (attached as Exhibit 1).  In the areas where Time Warner and Verizon compete, they are the two primary providers of cable television, Internet broadband, and telephone services.  *See id.* at ¶ 9.

Time Warner's traditional strength and principal advantage in marketing to consumers has been its provision of cable television, but it also offers a bundle of television, Internet, and telephone service that is known in the industry as a "triple play."  *See id.* at ¶ 4.  Until January 2005, Verizon could not deliver television, telephone and Internet service over the same signal line.  Instead, Verizon offered this triple play only in conjunction with DirecTV, a satellite television provider.

That all changed with the introduction to the marketplace of FiOS, a new 100% fiber-optic network to the home in which Verizon has invested an unprecedented $23 billion.  *See* Declaration of Michael P. Daigle at ¶ 4 (April 7, 2008) ("Daigle Decl.") (attached as Exhibit 2).  FiOS allows Verizon to deliver television, Internet broadband, and telephone service using fiber-optic technology. *See id.* at ¶ 5.  Verizon's 100% fiber-to-the-home FiOS network is superior to and more advanced than Time Warner's, which uses fiber only to a "node" – or central

4

point in a neighborhood – and then uses an older technology, coaxial cable, from the node to the homes of hundreds of consumers in the neighborhood. *See id.* at ¶¶ 6-7. Running fiber-optic cable to the home, instead of coaxial cable, makes FiOS faster, more powerful, more durable, and less subject to interference and data loss than Time Warner's network. *See id.* at ¶ 8. As of the end of December 2007, Verizon's FiOS network was capable of providing these services to more than 9.3 million homes and businesses in 17 states, including more than 2 million homes in the New York DMA. *See id.* at ¶¶ 4. Verizon expects to pass approximately 18 million homes with FiOS by year-end 2010, and a recent study released by the Fiber-to-the-Home Council, an industry group, Verizon "continues to set the pace" in fiber-to-the-home connections. *See* Fiber-to-the-Home Council News Release: *Fiber to the Home Connections Jump to Nearly Three Million as Next-Generation Broadband Deployment Continues* (April 8, 2008) (attached as Exhibit 3).

Because Time Warner's traditional area of expertise is television, Verizon's ability to compete with Time Warner depends in large part on Verizon's ability to convince consumers that its FiOS television service ("FiOS TV") is comparable or superior to Time Warner's television service. *See* Retta Decl. at ¶ 14. It is no surprise, then, that Time Warner's advertising is directed primarily at FiOS TV, or that Time Warner seeks through its commercials to convince consumers that the FiOS Network and FiOS TV are no improvement over Time Warner's existing product.

**The Satellite Dish Commercial**

Beginning on or about March 3, 2008, and continuing through the date of this memorandum, Time Warner has shown the Satellite Dish Commercial more than 160 times on six of the major broadcast channels in the New York DMA, including WABC, WNBC, and WCBS.  In addition, Time Warner has aired these commercials numerous times on several of its own cable television channels.

The commercial begins by showing a Time Warner customer in his kitchen, when he hears the doorbell and opens the door to find a Verizon.  *See* Storyboard for the Satellite Dish Commercial (copy attached as Exhibit 4).  When the Time Warner customer opens the door, the salesman waives his hands to create multi-colored fiber-optic beams of light and says: "Good morning. Have you heard about the fiber?"

Next, after the Time Warner customer indicates he is not interested, the salesman again gestures with his hands to create more fiber-optic beams of light that create a large "V" shape, and says: "But I'm talking about *Verizon's* kind of fiber."  The Time Warner customer responds: "And I'm talking Time Warner Cable.  They've been using fiber optics for over a decade.  Welcome to the program!"

The FiOS salesman then again waves his hand to reveal multi-colored optic beams and the word "fiber" in bright light, the Time Warner customer frowns and says: "Come on.  I get cable, internet and phone service together.  Just to get TV from you now, don't I need a satellite dish?"  At this, the FiOS salesman drops his

6

head in acknowledgement that this is indeed the case, and the colored fiber-optic beams of light he has created flicker and fizzle out.

The commercial then shifts to display a Time Warner graphic and an announcer states: "Call 1-800-OK-CABLE and experience Time Warner Cable's *advanced* fiber network." The commercial then concludes by making an offer of Time Warner triple play service and stating: "Get the triple play and say goodbye to Verizon." At the same time, the screen shows the FiOS Salesman, who drops his head and shoulders and, looking downward, turns to walk away.

As illustrated by the statements and visual imagery in the commercial, the Verizon salesman is there to sell Verizon's new FiOS service. Indeed, Verizon's own FiOS commercials also feature FiOS salesmen creating bright, multicolored lights representing the wonders of FiOS. The commercial, addressing Verizon's FiOS service, makes a number of false assertions to the viewer. First, the commercial falsely claims that a FiOS consumer requires satellite dish in order to receive television service. Second, the advertisement claims that Verizon is new to and inexperienced with the use of fiber-optic technology. Third, the message claims that Time Warner's network is superior to Verizon FiOS. Each of these claims about Verizon's FiOS service is literally and facially false. *See infra*, at 14-19.

### The 30 Second Commercial

Beginning in January 2008, and continuing through the date of this memorandum, Time Warner has also been airing a 30-second version of the

Satellite Dish Commercial. This shortened version omits certain false claims

included in the Satellite Dish Commercial, including the false claim that a FiOS

consumer needs a satellite dish to receive television.  It continues to include,

however, the claim that Verizon is new to the use of fiber optics while Time

Warner has been using it for over a decade.  After the FiOS salesman states that he

is "talking Verizon's kind of fiber," the Time Warner customer says: "And I'm

talking Time Warner Cable.  They've been using fiber optics for over a decade.

Welcome to the program."  *See* Storyboard for the 30 Second Commercial (copy

attached as Exhibit 5).  The advertisement's claims that Verizon is new to the use

of fiber optics, that Time Warner's use of fiber optics predates Verizon's use, and

Verizon's new fiber optic network is no better than Time Warner's own fiber optic

network are literally false.

**Verizon's Request that Time Warner Stop Airing the
Satellite Dish Commercial**

Verizon first learned of Time Warner's Satellite Dish Commercial on

March 31, 2008.  The next day, April 1, 2008, counsel for Verizon wrote a "cease

and desist" letter to Time Warner, pointing out the false claims in the commercial

and demanding that Time Warner provide written assurance within twenty-four

hours of receiving the letter that the commercial would be permanently

discontinued.  Counsel for Verizon followed up with a telephone call on April 2,

2008 to make the same demand.  In a letter dated April 3, 2008, counsel for Time

Warner rejected the contention that the Satellite Dish Commercial is false or

misleading and asserted its intention to continue running the commercial.  Verizon

has since learned that Time Warner plays a continuous loop of commercials,

including the Satellite Dish Commercial, on Time Warner's website.  *See* Satellite

Dish Commercial Screen Shot (attached as Exhibit 6).  In addition, Time Warner

responded to Verizon's April 1 request that Time Warner cease airing the false

Satellite Dish Commercial by showing it much more frequently.  *See* Retta Decl.

at ¶ 16.

On April 7, 2008, Verizon contacted Time Warner a third time, in order to

respond to Time Warner's defense of its commercials, to explain further the

several reasons why those commercials are false and misleading, and to repeat

Verizon's request that Time Warner cease disseminating the Satellite Dish

Commercial and the 30 Second Commercial.  As of the filing of this

Memorandum, Time Warner has not responded to that letter.  Accordingly,

Verizon respectfully requests relief from this Court.

## ARGUMENT

Verizon satisfies the well-established standard for granting a temporary

restraining order and preliminary injunction in this Circuit.  As the movant,

Verizon must show: (1) irreparable harm if relief is denied and (2) either (a) a

likelihood of success on the merits or (b) sufficiently serious questions going to

the merits to make them a fair ground for litigation and a balance of hardships

tipping decidedly in favor of the party requesting the preliminary relief.  *See*, *e.g.*,

*Castrol, Inc., v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir. 1992); *McNeil-PPC, Inc. v. Pfizer Inc.*, 351 F. Supp. 2d 226, 246 (S.D.N.Y. 2005); *see also Blast v. Fischer*, 07-CV-0567, 2007 U.S. Dist. LEXIS 71061, at *5 (W.D.N.Y. Sept. 19, 2007) ("The standard for a temporary restraining order in this Circuit is the same as for a preliminary injunction.").  Verizon meets this standard.

## I.    Verizon Is Likely To Succeed On The Merits

Section 43(a) of the Lanham Act provides, in pertinent part, that:

> Any person who, on or in connection with any goods or services . . . uses in commerce . . . any . . . false or misleading description of fact, or false or misleading representation of fact, which –
>
> . . . .
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

A plaintiff can show likelihood of success on a Lanham Act claim by showing that the advertisement in question is "literally" or facially false as a factual matter.[1]  *See Johnson & Johnson-Merck Consumer Pharms. Co. v.*

---

[1] The standards for analysis of false advertising claims under New York law are the same as under the Lanham Act.  *See Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 348 F. Supp. 2d 165, 177 n.6 (S.D.N.Y. 2004).  To state a claim under sections 349 and 350 of the New York General Business Law, a plaintiff must show that (1) the defendant engaged in a commercial practice or used an advertisement which was misleading in a material respect; and (2) the deceptive practice or advertising injured the plaintiff.  *See Towers Financial Corp. v. Dun & Bradstreet, Inc.*, 803 F. Supp. 820, 823 (S.D.N.Y. 1992) (citing *Mennen Co. v. Gillette Co.*, 565 F. Supp. 648, 655 (S.D.N.Y. 1983), *aff'd*, 742 F.2d 1437 (2d Cir. 1984); *McDonald v. North Shore Yacht Sales, Inc.*,

*SmithKline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992). "Where the advertising claim is shown to be literally false, the court may enjoin the use of the claim 'without reference to the advertisement's impact on the buying public.'" *McNeil-P.P.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991) (quoting *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 317 (2d Cir. 1982)).

As Time Warner has itself urged this Court successfully in the past, an advertisement may be literally false under the doctrine of "necessary implication" even if it is artfully crafted to avoid a direct statement of its false message, if "considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated" and the advertisement is "susceptible to no more than one interpretation." Reply Memorandum of Law in Support of Time Warner Cable's Motion for a Preliminary Injunction, *Time Warner Cable, Inc. v. DirecTV, Inc.*, No. 06 Civ. 14245 (LTS)(MHD), 2007 WL 672193, at 5 (S.D.N.Y filed Jan. 24, 2007) (citing *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 348 F. Supp. 2d 165, 182 (S.D.N.Y. 2004)). Under this doctrine:

> [A] district court evaluating whether an advertisement is literally
> false "must analyze the message conveyed in full context," i.e., it

---

134 Misc. 2d 910, 913-14, 513 N.Y.S.2d 590, 593 (Sup. Ct. Nassau Cty. 1987). Similarly, for the purpose of issuing a preliminary injunction, "the standards for unfair competition under New York law is essentially the same as that under § 43(a) of the Lanham Act." *Winner Int'l LLC v. Omori Enters.*, 60 F. Supp. 2d 62, 73 (E.D.N.Y. 1999) (citing *Safeway Stores, Inc. v. Safeway Properties, Inc.*, 307 F.2d 495, 498 n.1 (2d Cir. 1962); *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 363 (S.D.N.Y. 1998)).

"must consider the advertisement in its entirety and not . . . engage
in disputatious dissection."  If the words or images, considered in
context, necessarily imply a false message, the advertisement is
literally false and no extrinsic evidence of consumer confusion is
required.

*Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007)

(internal citations omitted); *see also Novartis Consumer Health, Inc. v. Johnson &
Johnson-Merck Pharm. Co.*, 290 F.3d 578, 586-87 (3d Cir. 2002) ("A 'literally

false' message may be either explicit or 'conveyed by necessary implication when,

considering the advertisement in its entirety, the audience would recognize the

claim as readily as if it had been explicitly stated.'") (internal citation omitted).

Both commercials are undeniably attacks on Verizon, and, specifically on

Verizon's FiOS network.  In both commercials, the Salesman admits that he is

there to discuss "Verizon's kind of fiber," which can only be understood by the

viewing audience as the service Verizon calls FiOS.  The *only* context in which

Verizon has advertised "fiber" to residential consumers is in advertisements for

FiOS.  *See* Retta Decl. at ¶ 15.  Indeed, the neon "Fiber" image the Salesman

makes with his hands is in the form of a large "V."  *See* Exhibit 4, Panel 3.  This is

apparently an attempt to spoof the visual theme of Verizon's own FiOS

advertisements, where FiOS salesmen open truck doors to reveal the fiber-optic

lights of FiOS.  *See* Storyboard for Verizon FiOS "Tech Kid" Commercial, Panel

4 (copy attached as Exhibit 7).  Moreover, in both commercials, the Verizon

Salesman indicates that the "Fiber" service he is selling is a new service by asking,

"Have you heard about the fiber?"  The Time Warner customer reinforces the

point by contrasting this new service with Time Warner, which has been using

fiber for "over a decade."  The only new service marketed to residential consumers

by Verizon as involving fiber optics, and the only new service the advertisement

could possibly be interpreted as discussing, is FiOS.  *See* Retta Decl. at ¶ 15.[2]

Both commercials not only target FiOS, they make false assertions about it.

First, the Satellite Dish Commercial falsely asserts that FiOS television service is

unavailable and FiOS customers require a satellite dish to get television.  Second,

both commercials imply falsely that Verizon is new to the use of fiber-optic

technology.  Third, the Satellite Dish Commercial implies falsely that Time

Warner's Network is superior to FiOS.  Verizon is likely to succeed on its federal

and state false advertising claims, because each of these false assertions in the

commercials is literally false.

### A.    The Satellite Dish Commercial's Claim that FiOS Television Service Requires a Satellite Dish Are Literally False

The Satellite Dish Commercial constitutes literally false advertising

because its words and images, considered in context, necessarily convey the false

---

[2] In areas not served by FiOS, Verizon offers television, in conjunction with its telephone and DSL-based Internet service, in association with DirecTV, which does require a satellite dish.  The Satellite Dish Commercial does not refer to this bundle but to FiOS.  The consumer in the advertisement represents someone who is able to purchase FiOS.  The commercial's Verizon salesman is there to tell him about (and sell him) the FiOS product.  And the consumer's skepticism is not directed to Verizon in general, but specifically to Verizon's "fiber" product – *i.e.*, FiOS.  Because satellite television is not provided over the FiOS network, and in fact competes with Verizon's own FiOS cable television service, Verizon has never mentioned satellite television in marketing FiOS. *See* Daigle Decl. at ¶ 13.

messages that (1) FiOS consumers require a satellite dish to receive television service from Verizon, and, therefore, that (2) Verizon's FiOS TV service is not currently available to customers in the New York DMA. *See Time Warner*, 497 F.3d at 158.

In the Satellite Dish Commercial a Time Warner customer rhetorically asks a Verizon salesman, "Just to get TV from you now, don't I need a satellite dish?" In response, the previously giddy Verizon salesman slumps his shoulders in silent acknowledgement, and stands crestfallen as the neon "Fiber" image flickers and fizzles out. The message to consumers in the New York DMA is clear and unambiguous: FiOS consumers need a satellite dish to receive television programming from Verizon and cannot receive television programming over the same fiber-optic cable that carries their telephone and high-speed Internet access service.

In fact, the FiOS TV service comes directly to the consumers' home via the fiber-optic cable connected to the home. *See* Daigle Decl. at ¶ 12. A satellite dish is unnecessary for FiOS TV. *See id.* Thus, Time Warner's claim that FiOS consumers cannot receive television service from Verizon without a satellite dish is "false on its face." *Ciba*, 348 F.Supp. 2d at 178 (internal quotation marks omitted). As of the end of 2007, Verizon was capable of providing FiOS TV to more than 2 million homes in the New York DMA. *See* Daigle Decl. at ¶ 4.[3]

---

[3] There are areas in the New York DMA where Verizon has deployed its FiOS network, but has not yet received the necessary approvals to offer its own television

These blatantly false assertions could not be more devastating to Verizon's $23 billion investment to compete with Time Warner and other cable companies on the provision of the triple play service to consumers. Television service is obviously the traditional strength of the cable companies, and Verizon's ability to provide television service through the FiOS network is essential to Verizon's ability to compete with Time Warner for all-important "triple play" of television, Internet, and telephone services. It is especially because of the extraordinary impact of these false assertions that Verizon seeks the extraordinary relief of a temporary restraining order.

### B.    Time Warner's Claim, In Both Commercials, That Verizon is New to the Use of Fiber-Optic Technology is Literally False

Both the Satellite Dish Commercial and the 30 Second Commercial constitute false advertising because their words and images, considered in context, undeniably imply falsely that Verizon is new to the use of fiber-optic technology. *See Time Warner*, 497 F.3d at 158.

Both commercials imply falsely that Time Warner's use of fiber optics predates Verizon's use of that technology, and that Verizon – through its FiOS product – is only now beginning to offer the technology that Time Warner has used all along. This is made clear, in both commercials, by the salesman's

---

service. In those areas, Verizon offers customers only high-speed Internet and telephone service over the FiOS network, as well as a bundle jointly marketed with DirecTV that also includes satellite television service. *See* Retta Decl. at ¶ 7. DirecTV's service is not FiOS TV and is not advertised as such. *See id.* Verizon continues to work to obtain authority to provide its FiOS TV service in additional areas in the New York DMA. *See id.*

introductory question – "Have you heard about the fiber?" – which indicates that FiOS is a new service. Thereafter, the point is driven home by the Time Warner customer's assertion that Time Warner has "been using fiber optics for over a decade. Welcome to the program." In the Satellite Dish Commercial, this point is further reinforced by the announcer's invitation for consumers to "experience Time Warner's advanced fiber network." The clear implication of this dialogue is that Verizon is new to the use of fiber-optic cable.

In fact, Verizon is not new to fiber-optic technology. Verizon has used fiber-optic technology in parts of its networks since the 1970's. *See* Daigle Decl. at ¶ 4. Specifically, just as Time Warner continues to use fiber-optic cables to transport television and data within its network, before shifting to coaxial cable from the node to its customer's premises, Verizon has long used fiber-optic cables to transport telephone calls and data within its network, before transferring those calls or data to copper wires that reach Verizon's customers' premises. *See id.* The introduction of FiOS just marks the first time that Verizon or any major provider of telephone or cable service has extended the use of fiber optics all the way to the home. Similarly, as the use of fiber-to-the home provides substantial benefits to customers, this also marks the first time Verizon has advertised its use of fiber-optic technology to residential consumers.

Taken together, the language in Time Warner's commercials regarding Verizon's "news" about fiber and Time Warner's use of fiber optics "for over a decade" clearly and unambiguously creates the false impression that Verizon is

new to the use of fiber optics.  *See S.C. Johnson & Son, Inc. v. Clorox Co.*, 241

F.3d 232, 238 (2d. Cir. 2001) (stating that when judging facial falsity, a court must

"'consider the advertisement in its entirety and not ... engage in disputatious

dissection. The entire mosaic should be viewed rather than each tile separately.'")

(quoting *Avis Rent A Car Sys., Inc. v. Hertz Corp.*, 782 F.2d 381, 385 (2d Cir.

1986)).

### C.    The Claim That Time Warner's Network Is Superior To Verizon's Network Is Literally False

The Satellite Dish Commercial also falsely implies that Time Warner's

network is superior to Verizon FiOS.  *See Time Warner*, 497 F.3d at 158.  That

assertion is literally false.

Time Warner's false claim of superiority rests on three legs.  *First*, as

discussed above, the Satellite Dish Commercial claims falsely that FiOS

consumers need a satellite dish to receive television programming from FiOS.

*Second*, as also discussed above, the Satellite Dish Commercial falsely claims that

Verizon is new to fiber-optic technology, while Time Warner has "been using

fiber optics for over a decade."  The clear implication of this is that Time Warner's

network is superior to Verizon's due to Time Warner's longer experience with

fiber.  *Third*, the Satellite Dish Commercial implies falsely that only Time Warner

– and not Verizon – offers a true "triple play" of television, telephone, and Internet

services.  Immediately after the Time Warner customer states, "I get cable,

internet, and phone service together," he implies that is impossible with Verizon

by asking, "Just to get TV from you now, don't I need a satellite dish?" Thereafter, an announcer drives home the false implication by directing consumers to "experience Time Warner Cable's *advanced* fiber network." Finally, the announcer directs consumers to "Get the triple play and say goodbye to Verizon."[4]

Taken together, these three claims clearly and unambiguously convey the false message that Time Warner's product is superior to FiOS. In fact, FiOS is the first and only large-scale network that delivers content all the way to a consumer's home or apartment building via a fiber-optic network. *See* Daigle Decl. at ¶ 4. Using the increased video and data bandwidth of fiber – rather than coaxial cable – to carry signals allows more data to get to and from the home faster, decreases the chance that the signal will be disrupted,[5] reduces the picture freezing, pixilation, dropped packets of data, and other interruptions in service and quality associated with coaxial cable, and provides a more durable conduit that is more resistant to corrosion. *See* Daigle Decl. at ¶ 8; *see also* Jeffrey A. Tompkins, *et al.*, White Paper: *Bridging the Last Mile: Access Network Wireline Architectures* at 8 (January 2001) (attached as Exhibit 8) (stating that the advantages of Fiber to the Home networks over cable networks like Time Warner's include "reliability,

---

[4] It is important to note that "triple play" is not a trade name for Time Warner's bundled service, but rather an industry term for bundling television, phone, and Internet, so the advertisement cannot be taken to merely state that Verizon does not offer the Time Warner branded product. *See* Retta Decl. at ¶ 4. Instead, the clear message of the commercial is that Verizon cannot offer these services in a bundled package through FiOS.

[5] Unlike fiber, coaxial cable is sensitive to electrical and radio interference. *See* Daigle Decl. at ¶ 8.

security and signal quality, just to name a few.").  As a result, as every

independent comparison has confirmed, services provided via FiOS are

undeniably superior to those provided on Time Warner's fiber-to-the-node and

coaxial cable-to-the-home network.  Indeed, the significance of FiOS is such that,

for the first time, Verizon has begun advertising its use of fiber-optic technology

to residential consumers.

* * *

Time Warner's commercials make multiple literally false claims in

comparing their product with Verizon FiOS.  These false claims are material,

likely influencing the purchasing decisions of potential customers of Verizon and

Time Warner as explained below.  Thus, Verizon is likely to prevail on its claims

that Time Warner's commercials constitute and false and deceptive advertising in

violation of the Lanham Act and New York General Business Law §§ 349 & 350.

## II.    Verizon Will Suffer Irreparable Injury Absent a Temporary Restraining Order and Preliminary Injunction

Verizon also satisfies the second requirement for obtaining preliminary

relief, irreparable harm if relief is denied.  For unless Time Warner is restrained

from running the false and misleading commercials, Verizon will be irreparably

harmed through damage to its reputation, loss of goodwill, and loss of both

customers and potential customers.

A court should presume that, without relief, the plaintiff will be irreparably

harmed when an advertisement is both literally false and draws a direct

19

comparison to the plaintiff. *See Castrol*, 977 F.2d at 62 (irreparable injury should be presumed "where [the] plaintiff demonstrates a likelihood of success in showing literally false [the] defendant's comparative advertisement which mentions the plaintiff's product by name"). The Second Circuit, adopting the argument propounded by Time Warner last year, further explained that the presumption also applies to a literally false commercial that does not identify the plaintiff or product when "it would be obvious to the viewing audience that the advertisement is targeted at the plaintiff." *Time Warner Cable*, 497 F.3d at 148; *see also* Brief for Plaintiff Appellee, *Time Warner Cable, Inc., v. DIRECTV, Inc.*, No. 07-0468-civ (2d Cir. filed Apr. 13, 2007); Memorandum in Support of Time Warner Cable's Second Motion for a Preliminary Injunction, *Time Warner Cable, Inc. v. DIRECTV, Inc.*, No. 06 Civ. 14245 (LTS) (MHD), 2007 WL 1025158, at 16 (S.D.N.Y. filed Feb. 7, 2007).[6]

Time Warner's false advertisement creates this presumption of irreparable harm. First, the advertisements are literally false by stating that a satellite is necessary to receive FiOS television service, by stating that Verizon is new to using fiber optics, and by claiming that Time Warner offering is superior to that provided by Verizon. *See supra*, at 14-19 (explaining that Time Warner's advertisements were literally false). Second, Time Warner's false commercial

---

[6] Similarly in *McNeil-PPC*, 351 F. Supp. 2d at 250, the Court presumed irreparable harm from a false advertisement because the commercial effectively referred to the plaintiff's product despite the fact that it mentioned neither the plaintiff nor its product.

also draws a direct and explicit comparison to Verizon's FiOS service when it discusses "Verizon's kind of fiber," using Verizon's own visual effects and noting that it was Verizon's new service. *See supra*, at 12-13 (explaining that the Satellite Dish Commercial necessarily draws a comparison to Verizon's FiOS service). There can be no doubt from these commercials that "it would be obvious to the viewing audience that the advertisement is targeted at the plaintiff." *Time Warner Cable*, 497 F.3d at 148.

In addition to this dispositive presumption, the Court should infer irreparable harm from the fact that the false advertisement is made by Verizon's direct competitor. When a plaintiff's direct competitor falsely advertises, a court should infer that the plaintiff's reputation and customer base will be irreparably harmed. *See Schick Mfg., Inc. v. Gillette Co.*, 372 F. Supp. 2d 273, 287 (D. Conn. 2005) (fact that parties are "head-to-head competitors supports an inference" that a literally false advertisement will cause irreparable harm). Time Warner is a head-to-head competitor of Verizon's FiOS service in many parts of the New York Metropolitan area. *See* Retta Decl at ¶¶ 4, 14. FiOS service has been received with great enthusiasm and its expansion continues to make it the principal competitor to the traditionally monopolistic cable companies. *See id.* at ¶¶ 8, 9; Daigle Decl. at ¶ 11. In those areas where Time Warner and Verizon's FiOS overlap, they serve as the two primary providers of for television, Internet, and phone service. *See* Retta Decl. at ¶ 9. As the principal competitor in the area of overlap, Verizon is irreparably harmed by Time Warner's false advertisement.

21

Even independent of the presumption and the inference, Verizon's irreparable harm is apparent. Time Warner's false advertisements attempt to lure customers to subscribe to or to remain with Time Warner's services and to brand Verizon as inexperienced in the use of fiber-optic cable and FiOS as an inferior service. Indeed, Time Warner's false advertisements specifically target FiOS's ability to deliver television – not Internet or telephone – service, because that is the traditional strength of cable companies that Verizon must overcome to convince consumers to purchase the FiOS triple play. Luring customers with these false advertisements will reduce, by definition, the subscription sales and customer base of Verizon, as Time Warner's direct competitor. Because the costs of switching from Time Warner to Verizon's FiOS are not insignificant, *see id.* at ¶ 13, Time Warner's false statements make it particularly difficult for FiOS to penetrate the market. Because the false claims of the Satellite Dish Commercial, especially, strike so fundamentally at Verizon's $23 billion investment to bring consumers the triple play of services via FiOS, a temporary restraining order is particularly warranted for that commercial.

Additionally, the advertisements' necessary implication that Verizon is inexperienced with fiber optics and provides an inferior service causes harm to Verizon's reputation as providing easy, cutting-edge solutions. While these harms, directly caused by the false Time Warner advertisements, cannot be easily quantified or repaired, they are quite significant.

22

## CONCLUSION

For all the foregoing reasons, Verizon respectfully submits that its Motion for An Order to Show Cause on A Preliminary Injunction and For A Temporary Restraining Order should be granted.

Dated: April 9, 2008

Respectfully submitted,

K. CHRIS TODD (KT – 8956)
JAMES M. WEBSTER, III
JULIUS N. RICHARDSON
ANDREW M. HETHERINGTON
**KELLOGG, HUBER, HANSEN, TODD,**
    **EVANS & FIGEL, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: 202.326.7900
Facsimile: 202.326.7999

*Counsel for Verizon New York, Inc.*

*Of Counsel:*

W. DAVID HUBBARD
Verizon
1515 N. Courthouse Rd., Suite 500
Arlington, VA  22201-2909
Telephone:  703.351.3176
Facsimile: 703.351.3664

# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x
**VERIZON NEW YORK INC.,**                  :
                                            :    08 Civ. _____
                       Plaintiff,           :
                                            :    **DECLARATION OF**
           v.                               :    **SUSAN M. RETTA IN**
                                            :    **SUPPORT OF VERIZON**
**TIME WARNER CABLE, INC.,**                :    **NEW YORK INC.'S MOTION**
                                            :    **FOR A TEMPORARY**
                       Defendant.           :    **RESTRAINING ORDER**
---------------------------------------------------x

I, Susan M. Retta, declare as follows:

1.      My name is Susan M. Retta.  I am of legal age and under no disability.  I have personal knowledge of the facts stated in this Declaration and know them to be true and correct.

2.      I graduated from Iona College with a BBA Degree, and Pace University with an MBA Degree.  I have spent over 10 years in marketing positions with Verizon.

3.      In my position as Vice President-Marketing for Verizon, I am responsible for Broadband Solutions for the Consumer segment.  These responsibilities include product and offer management for our portfolio of broadband access services and applications, for both our copper and fiber networks.  Consequently, I am familiar with the history of Verizon's advertising of fiber-optic technology and FiOS to residential consumers, and with Verizon's negotiations with the City of New York regarding Verizon's application for a video franchise for the City.

4.      Verizon and Time Warner compete for subscribers to the services on their respective networks.  That competition includes sales in and around the New York

metropolitan market.  Both Verizon and Time Warner offer Internet access, television, and telephone service.  Verizon offers a bundled package of Internet access ("FiOS Internet"), television ("FiOS TV"), and telephone service through FiOS.  This package of all three services is known in the industry as a "triple play."

5.       Designated Market Areas ("DMAs") are geographic market designations that define each television market exclusive of others, based on measured viewing patterns.  DMAs are made up of contiguous counties jointly covered by a group of television stations.  The New York DMA includes 29 counties: fourteen in New York (Bronx, Dutchess, Kings, Nassau, New York, Orange, Putnam, Queens, Richmond, Rockland, Suffolk, Sullivan, Ulster, and Westchester), thirteen counties in New Jersey (Bergen, Essex, Hudson, Hunterdon, Middlesex, Monmouth, Morris, Ocean, Passaic, Somerset, Sussex, Union, and Warren), one in Pennsylvania (Pike), and one in Connecticut (Fairfield).

6.       Verizon's FiOS network is available in parts of 23 counties within the New York DMA, including twelve counties in New York (Dutchess, Orange, Putnam, Rockland, Westchester, Nassau, Queens, Suffolk, Kings, New York, Staten Island, and Bronx), ten counties in New Jersey (Bergen, Essex, Hudson, Middlesex, Monmouth, Morris, Ocean, Passaic, Somerset, and Union), and one in Connecticut (Fairfield).

7.       Due to regulatory prohibitions, Verizon is barred from offering FiOS TV in certain parts of the New York DMA, including Manhattan.  There are no technical limitations prohibiting the provision of television service over Verizon's FiOS network, but Verizon is currently prohibited by regulation from providing television service through the FiOS network until it receives approval from the local franchising authority

to offer the service.  Verizon currently provides only Internet and telephone services on its FiOS network in Manhattan.  A Verizon FiOS Internet and phone customer in Manhattan may obtain television service from Time Warner, DirecTV, or other franchised providers.  DirecTV's service is not FiOS TV and is not advertised as such. Verizon continues to work to obtain authority to provide its FiOS TV service in additional areas in the New York DMA.

8.      Verizon's FiOS expansion makes it the principal competitor to the traditional cable companies in areas of overlapping service.

**9.**      In the areas within the 10 counties of the New York DMA where Time Warner and Verizon's FiOS network overlap, Time Warner and Verizon are the two primary providers of cable television, Internet, and phone services**.**

10.      Advertisements influence consumers' choice between Verizon's FiOS services and Time Warner's competitive offerings.  Advertisements that compare one service to another have the effect of shifting new customers from one service to the other. Such advertisements also have the effect of influencing current customer's decision to switch providers.

11.      False advertisements stating that Verizon's FiOS network requires a satellite for television service, that Verizon is new to the use of fiber-optic technology, and that Verizon provides inferior services through FiOS deprive Verizon of new FiOS customers and serve to decrease the number of Time Warner customers that will switch from Time Warner to FiOS.

12.     Verizon is significantly harmed by being deprived of customers.  FiOS customers are crucial to Verizon's economic business model for deploying the FiOS network.

13.     Changing from one provider of television, Internet, or telephone services to another imposes switching costs.

14.     Time Warner has a strong tradition as a provider of cable television.  Its strength as a competitor to a traditional telephone company like Verizon is as a provider of television.  In order to compete with a "triple play" of services, it is very important that Verizon is able to convince consumers that its FiOS TV service offering is competitive with Time Warner's television service.

15.     Although Verizon has employed fiber-optic technology in its network since the 1970's, it never advertised the residential use and advantages of fiber optics until it introduced its FiOS fiber-to-the-home network.  This advertising began in 2004.  Likewise, Verizon instituted its door-to-door consumer marketing campaign only in connection with its introduction of FiOS products and services.  FiOS products and services are the only new fiber optics based services marketed to residential customers by Verizon.

16.     Statistics available to Verizon show that since April 1, 2008, Time Warner has increased the frequency with which it has shown the commercial that I understand is referred to as the "Satellite Dish" commercial in the pleadings in this matter.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Executed at ___BASKING RIDGE, NJ___, April __9__, 2008.

_Susan M. Retta_
Susan M. Retta

Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
**VERIZON NEW YORK INC.,**                  :
                                        :     08 Civ. _____
          Plaintiff, :
                                        :     **DECLARATION OF**
         v.  :     **MICHAEL P. DAIGLE IN**
                                        :     **SUPPORT OF VERIZON**
**TIME WARNER CABLE, INC.,**                :     **NEW YORK INC.'S MOTION**
                                        :     **FOR A TEMPORARY**
        Defendant. :     **RESTRAINING ORDER**
-------------------------------------------------------x

I, Michael P. Daigle, declare as follows:

       1.      My name is Michael P. Daigle.  I am of legal age and under no disability. I have personal knowledge of the facts stated in this Declaration and know them to be true and correct.

       2.      I graduated from Roger Williams University with a Bachelor of Science in Electrical Engineering and Mathematics.  I received a Master of Science in Project Management from George Washington University.  I have spent twenty-four years in engineering and planning positions with Verizon, Bell Atlantic, NYNEX, and New England Telephone.

       3.      In my position as Vice President Network Planning for Verizon, I am responsible for fundamental planning for the Verizon Telecom network.  These responsibilities include tactical planning, vendor selection, technology management, and engineering support for Verizon's 100% fiber-to-the-premises FiOS network. Consequently, I am familiar with the engineering, installation, support, and network capabilities of the FiOS network.  In addition, based on my various jobs at Verizon, I am

familiar with Verizon's historical use of fiber optic cable prior to the introduction of FiOS.

4.      Verizon has used fiber-optic technology in parts of its networks since the 1970's, in order to transport telephone calls and data within its network, before transferring those calls or data to copper wires that reach Verizon's customers' premises. In 2004, Verizon began a $23 billion program to build a nationwide, state-of-the-art, fiber-to-the-premises network under the FiOS service mark, providing voice, video/television, and Internet services.  Verizon is the first major telecommunications carrier in the nation to deploy such a network to this magnitude.  As of the end of 2006, the FiOS network passed more than 6 million homes, doubling the number of premises passed in 2005.  A household is "passed" if the fiber-optic cable necessary to provide service to that household has been laid, which is the first step in establishing service to the home.  As of the end of 2007, the FiOS network passed more than 9 million homes, including more than 2 million homes in the New York DMA.  Availability of the FiOS network is increasing rapidly each week.

5.      The fiber-optic cable employed by the FiOS network delivers laser-generated pulses of light on hair-thin strands of glass fiber carrying vast amounts of data at high speeds.  FiOS allows Verizon to offer its customers robust video services and fast, reliable broadband Internet access speeds with the capability to meet Verizon customers' needs for the foreseeable future.

6.      FiOS carries digital voice, data and video services with much greater bandwidth – *i.e.*, the amount of data that can be carried over the network – than traditional coaxial cable.  The fiber in the FiOS network carries three distinct

wavelengths of light – one for broadcast television, one for downstream data (including Internet downloads, video on-demand, and voice), and one for upstream data (including Internet uploads, video on-demand signaling, and voice). The wavelength that delivers FiOS' broadcast television alone provides as much bandwidth to a customer's home as cable typically has available for all services combined. By contrast, Time Warner Cable, Inc. ("Time Warner") offers its television and video programming through the same coaxial cable over which it transmits telephone and Internet access service.

7.     The FiOS network uses its superior fiber lines all the way to the customer's premises from its central offices, whereas cable providers generally use fiber only to a "node" – a central facility typically serving approximately 500 homes – and coaxial cable from the node to the home. Verizon's non-FiOS networks employ many designs, including the use of fiber to carry communications to the node and copper telephone lines to deliver communications to the home. Using fiber lines to connect all the way to the consumer's premises provides superior service.

8.     Verizon FiOS customers benefit from the superior design of FiOS. Having fiber (rather than coaxial cable) carry signals to and from the home increases the likelihood that those signals will reach the user without disruption. For example, while coaxial cable is sensitive to electrical and radio interference, fiber is immune to such interference. Because of the inherent, inferior properties of a coaxial cable system and its greater propensity (compared to fiber) to corrode over time, cable customers may experience reduced service quality. Viewers of analog television stations may see white spots (referred to as "noise"); viewers of digital programming may experience picture freezing or pixelation of sections of the screen; and Internet users will

3

experience "dropped" packets when sending or receiving data, resulting in overall reductions in speed. These issues are minimized and virtually nonexistent on the FiOS Network.  FiOS customers do not typically face these disruptions and distortions to the quality of their network services.

9.      Running 100% fiber optics to the customer's premises via the FiOS network allows Verizon to deliver more video and data bandwidth to the customer's door, thereby allowing more content to be delivered to and throughout the home at faster speeds.

10.     In addition, each FiOS customer shares the available bandwidth from Verizon's central offices to the home with no more than 31 other users.  A cable customer, in contrast, may be required to share available bandwidth with hundreds of other users from the node to the home.

11.     Verizon's 100% fiber-to-the-home FiOS network is superior to and more advanced than Time Warner's network, which utilizes fiber only to connect to the node and uses coaxial cable to connect the node to the customer's home.  The superiority of FiOS over Time Warner's services has been confirmed by every survey or study of which I am aware.

12.     A satellite dish at the home is not and never has been required in order for consumers to receive FiOS TV television programming through Verizon's FiOS network.  To the contrary, FiOS' fiber-optic lines go all the way to the home.

13.     Likewise, Verizon has never offered a satellite dish service to consumers in connection with its FiOS products and services.  As a result, Verizon has never mentioned satellite television in any marketing for FiOS products and services.

4

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Executed at ___ANWANDALE , NJ_____, April __9___, 2008.

_____
Michael P. Daigle

Exhibit 3



# Exhibit 4

**vms**

| | | | |
|---|---|---|---|
| **PRODUCT** | Time Warner Cable Triple Play | **LENGTH** | :60 |
| **MARKET** | New York, NY | **STATION** | WPIX |
| **PROGRAM** | Judge Maria Lopez | **DATE** | 03-03-2008 |
| **CODE #** | 080301834 | **TIME** | 1:57 PM |
| **TITLE** | Man With Fiber Mocks Verizon Guy | | |



(SFX: BACKGROUND TV SOUNDS IN)



(SFX: OUT) (SFX: DOORBELL)
MAN #1:  This should be fun.



MAN #2:  Good morning.  Have you heard about the fiber?
MAN #1:  I think I'm taken cared of in that department.



MAN #2:  But I'm talking Verizon's kind of fiber.
MAN #1:  And I'm talking Time Warner Cable.  They've been using fiber optics for over a decade.



Welcome to the program.



MAN #2:  But-- (SFX: SWOOSH)



MAN #1:  Come on.  I get cable, internet and phone service together.  Just to get TV from you now, don't I need a satellite dish?



(MUSIC IN) (SFX:  LOSING POWER)



FEMALE ANNCR:  Call 1-800-OK-CABLE and experience Time Warner Cable's advanced fiber network

SUPER: (ILLEGIBLE)



with the Triple Play.  Cable, high speed internet and home phone service



just 89.95 a month for the first 12 months.

SUPER: (ILLEGIBLE)



Get the Triple Play and say goodbye to Verizon.
(MUSIC OUT)

**VIDEO ALSO AVAILABLE IN ANALOG & DIGITAL FORMATS**

Material supplied by VMS may be used for internal review, analysis or research only. Any editing, reproduction, publication, re-broadcasting, public showing or display for profit is forbidden and may violate copyright law.

1500 Broadway, 6th Floor, New York, NY 10036  T  212 736 2010

Exhibit 5


**vms**

| | | | |
|---|---|---|---|
| **PRODUCT** | Time Warner Cable Triple Play | **LENGTH** | :30 |
| **MARKET** | New York, NY | **STATION** | WWOR |
| **PROGRAM** | Divorce Court | **DATE** | 01/02/2008 |
| **CODE #** | 080100869 | **TIME** | 10:22 AM |
| **TITLE** | Man With Fiber Mocks Verizon Guy At Door/ | **REV OF #** | 070608909 |


(MUSIC IN) (SFX: THUD, DOORBELL)


MAN: (SIGH)


VERIZON GUY: Good morning.


Have you heard about the fiber? (SFX: WHIRR)


MAN: I think I'm taken care of in that department.


VERIZON GUY: But I'm talkin' (SFX: WHIRR/BOOM) Verizon's kind of fiber.


MAN: And I'm talkin' Time Warner Cable. They've been using fiber optics for over than a decade.


Welcome to the program. (MUSIC IN)


FEMALE ANNCR: Call 1-800-OKCable for Time Warner Cable's Triple Play:


Cable, High Speed Internet and Home Phone Service,


just $89.95 a month for the first 12 months.

SUPER: (ILLEGIBLE)


MAN: Ooh, you're lookin' a little bunched up. Need some help? (MUSIC OUT

___VIDEO ALSO AVAILABLE IN ANALOG & DIGITAL FORMATS___

Material supplied by VMS may be used for internal review, analysis or research only. Any editing, reproduction, publication, re-broadcasting, public showing or display for profit is forbidden and may violate copyright law.

1500 Broadway, 6th Floor, New York, NY 10036  T 212 736 2010

Exhibit 6



# New York & New Jersey

[Change My Location] | Home | My Web Site | Corporate | Contact Us

About Us | Products | Programming | Customer Service | Business Services | In the Community    SEARCH: >>



TRIPLE PLAY
## GET IT TOGETHER

Don't you deserve the works?

- Three great services, one low price
- Cable: On Demand, FREE HD, NY1 News & more
- Internet: Fast, safe and reliable
- Phone: Unlimited calling & popular calling features

Order Now ▶

Get Triple Play details »

DIGITAL CABLE | HIGH SPEED ONLINE | HOME PHONE | TRIPLE PLAY          + Quick Links





En Español
Clic aqui.

Triple Play $89⁹⁵ a month for the first year

Order Now

◀ ❚❚ ▶    PAY YOUR BILL ONLINE My Account    FIND OFFERS NEAR YOU  ZIP Code  GO

Parental Control | Careers | Site Map | Privacy Policy + Terms of Use | Investor Relations    A+ A-

© 2008 Time Warner Cable Inc. All rights reserved.

twcnyc.com

4/3/08 7:25PM

Exhibit 7

**Verizon FiOS: "Tech Kid" Commercial**





Boy: Are you the cable guy?



Tech: Actually I'm a Verizon FiOS tech. I bring fiber optics right to your door on three different spectrums of light. You got your 1310, your 1490 and the 1550. The light is so clean its plus 20 DP hot. It's true kwam.



SFX: MUSIC



Boy:  Nice truck.



AVO: Verizon FiOS. The most advanced fiber optic network straight to your home.





Exhibit 8



WP6300
January 2001

# Bridging The Last Mile
# Access Network Wireline Architectures

Jeffrey A. Tompkins, Senior Market Development Engineer
Jeffrey R. Jacobs, Market Development Engineering Manager, Access & Premises Networks
Jane Li, Market Manager
Corning Inc.
tompkinsja@corning.com

Abstract

There is no single correct solution to bridging the last mile and bringing broadband to the home.  There are many different architectures being used to increase data rate, service offerings and quality of service to homes and businesses.  The purpose of this writing is to discuss various wireline architectures, compare them, establish a general understanding of each and use this information as framework for investigating future network decisions.



WP6300
January 2001

# Bridging The Last Mile
# Access Network Wireline Architectures

Jeffrey A. Tompkins, Senior Market Development Engineer
Jeffrey R. Jacobs, Market Development Engineering Manager, Access & Premises Networks
Jane Li, Market Manager
Corning Inc.
tompkinsja@corning.com

There is no single correct solution to bridging the last mile and bringing broadband to the home. There are many different architectures being used to increase data rate, service offerings and quality of service to homes and businesses. The purpose of this writing is to discuss various wireline architectures, compare them, establish a general understanding of each and use this information as framework for investigating future network decisions.

Although wireless and satellite architectures can be viable broadband alternatives for bridging the last mile, they are beyond the scope of this article. For the purpose of comparison, we will examine copper-based and fiber-rich wireline alternatives. Included are several graphics allowing comparison of the different alternatives. Figure 1 is a physical representation of each network, while Figures 2 and 3 provide some economic comparisons of first costs and costs over time which takes into account maintenance cost savings. Table 1 is a comparison summary on different issues facing network designers.

Generally speaking, some basic assertions can be made about all wireline architectures:

♦ The deeper the fiber is used in the architecture, the higher the first installed cost. This is due to fewer and fewer customers sharing the cost of the electronics that convert the signal from optical to electrical, or convert a signal from one format to another.

♦ The deeper the fiber is used in the architecture, the lower the maintenance costs. This is due to fewer active components, such as amplifiers, that may be a point of failure in the network, and more use of, and higher reliability of optical components.

♦ The deeper the fiber is used in the architecture, the more services you can provide. This is due to the large bandwidth capacity of fiber, and the inherent bandwidth limitations of metallic media.



Figure 1. *Physical representation of each architecture.*



CORNING

WP6300
January 2001

## The Telco Legacy Network

**Approach:**  The first architecture discussed is the telephone legacy network.  In this network, copper unshielded twisted pair (UTP)  extends from the telephone company's central office to each residence or business.  Though originally designed and implemented for voice only, many technology options have been developed to extend this architecture to provide high-speed data and other services.  The most prominent of these is Digital Subscriber Line (xDSL) technology.  For the purpose of this discussion, we'll focus on Asymmetric Digital Subscriber Line (ADSL) technology.  Other varieties of DSL also can be used with this architecture, but at this writing, ADSL seems to be the most popular.  Both Incumbent Local Exchange Carriers (ILECs) and Competitive Local Exchange Carriers (CLECs) currently are offering this technology to provide high-speed data and voice to the home.  ADSL can bring 1.544 to 8 Mbps downstream and 16 kbps to 1.1 Mbps upstream on the existing wiring.  This is the telephone company's competetive solution to the large bandwidth that a cable modem can provide.

**Description:**  ADSL requires multiplexing equipment at the Central Office (CO) called a DSL Access Multiplexer (DSLAM) to aggregate traffic for backbone transport.  The voice calls are split off on their way through the existing Public Switched Telephone Network (PSTN), while the data is sent on to data backbones.  At the subscriber, a splitter must be installed on the side of the house at the demarcation point to separate voice and data traffic.  The voice will run over the existing UTP in the house and shall remain usable even when there is a power outage.  The data will be sent over a newly installed UTP wire to the location of the computer in the house and will not work during a power outage.  The computer will require an ADSL modem.

ADSL typically is used over UTP copper pairs, which effectively limits the distance for higher data rates.  Typical distance limitations for the lowest bit rates are about 18,000 feet (5.49 km).  However, DSL equipment can also be placed in the field, extending DSLs reach, using optical fiber to aggregate the traffic back to the CO.

Splitterless ADSL, sometimes called G.Lite or ADSL Lite, is a cousin of ADSL that does not require a splitter to separate voice and data.  While this reduces cost, complexity and installation labor, interference may occur resulting in the need to use filters at each phone.  With G.Lite, bandwidth is limited to 1.5 Mbps downstream and 384 kbps upstream.

**Advantages:**  The major advantage of ADSL and G.Lite is that they can be run over the existing copper infrastructure which exists for most telephone companies.  It is a way to bring a relatively high bandwidth to the home quickly.  The American National Standards Institute (ANSI) has a standard for ADSL which may result in reduced electronics cost.  It also provides for a dedicated line and guaranteed bandwidth, so bandwidth is not shared amongst subscribers, making ADSL a more secure and reliable data delivery option.

**Disadvantages:**  Though on the outside, this architecture may appear to have all the answers, there are some significant drawbacks.  Many subscribers do not have access to DSL service if they are outside the distance limit, have older copper lines that do not pass qualification tests or have lines that have certain devices attached such as loading coils or bridged taps.  Some analysts estimate the portion of subscribers that can be served with ADSL may be as low as 40%.  Although bandwidth is significantly higher than dial-up, and compared to other high-speed options, the bandwidth ADSL provides is relatively low.  There also is a possibility that the  asymmetric nature of the technology will not support symmetric services such as two-way videoconferencing.

**Summary:**  Even though the first installed cost may be very low, the maintenance of an all copper network



WP6300

January 2001

is high. It would seem that this may be a good solution for those heavily invested in a copper infrastructure, but will not satisfy the consumer in years to come, especially as bandwidth demand continues to grow and new services continue to be offered. The next upgrade to this network will most likely be a combination of fiber and CO electronics in the field (possible fiber to the curb), making upgrades a very costly proposition.



CORNING

WP6300
January 2001

| Issue \ Architecture | ADSL | HFC | FTTC | FTTH | Overlay |
|---|---|---|---|---|---|
| Downstream bandwidth | 1.544 – 8 Mbps | 500 kbps – 30 Mbps | 25 – 52 Mbps | 10+ Gbps | 10+ Gbps |
| Upstream bandwidth | 16 kbps – 1.1 Mbps | 100 kbps | 25 – 52 Mbps | 10+ Gbps | 10+ Gbps |
| Maintenance cost | High | High | Low | Low | High |
| Security | Not shared | Shared | Shared | Not shared | Not shared |
| Uses existing plant | All | Most | Some | None | Some |
| Installed first cost | Low | Low | Medium | High | High |
| Deployment time | Fast | Fast | Medium | Slow | Slow |

Table 1. *Table comparing the different architectures with respect to common issues facing network designers.*

## HFC (Hybrid Fiber Coax)

**Approach:**  The first real network upgrades took place in the unregulated cable TV industry.  These upgrades were done to lengthen the reach of a clean TV signal and prepare for two-way data communication, while preserving the existing coaxial network.  A problem with existing all-coaxial networks is the cascade of radio-frequency (RF) amplifiers that not only boost the signal, but also introduce a significant amount of noise.  To make matters worse, for data communications, the coax worked as a shared media in a bus architecture.  The tree-and-branch coaxial network worked great for broadcasting a video signal, but with two-way data, suffered from an infusion of aggregated ingress noise at each home and a division of bandwidth amongst the homes sharing the media.  In order to combat this, data receivers are configured to serve fewer homes and fiber is used to bypass existing coax and reduce the number of necessary RF amplifiers.  This is the goal of the HFC network.

**Description:**  Fiber extends from the headend out to an optical receiver node in the field where the signal then is transferred to the coax. The node may serve 500 to 2000 homes.  If there are more subscribers or a desired increase in bandwidth, the nodes may be split to service fewer homes.  Additional fiber can be extended to the node (or dark fiber lit) and another receiver added in the same location.  Another more costly option is to place a node deeper in the network and adjust the amplifiers to support the new node. The more the nodes are split, the less sharing of bandwidth will take place, leading to higher data rates per home.

Cable modems deliver high speed data over the HFC architecture using a large downstream channel with data rates from hundreds of kbps to 30 Mbps.  Because of the shared nature of the network, effective throughput is on the order of hundreds of kbps.  The upstream path is quite small at 100 kbps and, at current writing, is plagued with ingress noise problems.  Work to address these issues is underway.

The interface at the house is relatively simple.  Most people with cable receive an enhanced set-top- box with interfaces for telephones and Ethernet jacks for data, or they might receive a separate cable modem. The subscribers then need an Ethernet NIC installed.  Of all the architectures, there may be  more of a comfort level with the electronics involved with HFC.

**Advantages**:  For those with a coax network, this may be a relatively fast deployment with relatively low installed first costs.  This will also quickly improve existing TV service.  It also utilizes the existing network as the bypassed coaxial network still can be used for powering.  Furthermore, due to the



CORNING

WP6300
January 2001

combination of fiber and coaxial cable, the provider has a high bandwidth network that supports voice, two-way data, broadcast and interactive video and a host of future services. The service provider can market to select areas for upgrades to these advanced services.

**Disadvantages:** HFC has some technical, operational and possible regulatory issues. On the technical side, the upstream bandwidth is small and noisy. Also, due to the shared bandwidth, security can be an issue. On the operations side, the RF amplifiers bring a higher operational cost and a lower reliability. Finally, though the cable TV industry has operated mostly unregulated, regulatory bodies have focused on network access, as new high-speed data and voice services are beginning to be offered.

**Summary:** HFC is a natural evolution of the original cable TV infrastructure and can lead directly to a more fiber-rich network, akin to a fiber-to-the-curb architecture. This allows the network provider to improve the network in select areas, and be the first single provider of data, voice, and video. As an upgrade solution, a 500 home node HFC is a great way to go, but for new builds, the reliability and maintenance savings from fewer RF components may make a more passive network a potentially better consideration.



Figure 2. *Cost per home passed over time, including maintenance cost savings, based on a high density neighborhood.*

## FTTC (Fiber to the Curb)

**Approach:** Though fiber to the home has not been widely deployed to date, fiber has definitely made its way deep into neighborhood networks through a fiber to the curb architecture. Telephone companies have found that bringing fiber to just outside the house, rather than to the house, still can provide large bandwidth and utilize most of the UTP drop cables, that extend from the curb to the house, existent in their older infrastructure. Cable TV companies can use this concept to upgrade to a passive network and may avoid the costly and unreliable amplifiers in their current HFC architectures. New entrants also may bypass the existing copper and coax-network providers and deliver enough bandwidth for data, voice, and video, thus forcing the current service providers out of the home. The future may be that the incumbent service provider moves to this architecture to provide homes with multiple high bandwidth services.

**Description:** FTTC falls into a general class of fiber-rich architectures called FTTx, fiber-to-the-



**CORNING**

WP6300
January 2001

something.  These have fiber extending from the central office to a node in the field.  Here the signal can be split and sent to optical interface points throughout the neighborhood.  This serves as the termination point for the fiber, while the signal continues to the house on copper or coax.  The difference between fiber-to-the-curb, -cabinet, -node or whatever is how deep the fiber goes, which translates into how many subscribers will share the cost of the optical networking unit (ONU).  FTTC usually will support 8-24 homes on one ONU.  Different data formats will exist, and to scale the last mile.  This could be very high rate digital subscriber line (VDSL), asynchronous transfer mode (ATM), Ethernet, or some other technology.  The bandwidth will depend on the transport used and the length of copper in the system, but likely will be around 25-52 Mbps.



CORNING

WP6300
January 2001

Advantages: FTTC has fewer active electronics, resulting in fewer network interruptions and lower maintenance costs. It also allows existing networks to be upgraded to a broadband FTTC solution, while maintaining the existing copper drop lines. This provides a high bandwidth capacity to the home, and allows for an upgrade to FTTH if the bandwidth requirement is exceeded in the future or if the economics of a fiber drop catches up with the copper drop.

**Disadvantages:**  There are higher installed first costs and the network is slower to market due to the larger volume of fiber present in this network design. Other technical issues exist as well. The copper distance using VDSL is short at 200m. Also, during deployments of this technology, it was found that the frequencies used for VDSL interfered with wireless devices, such as ham radios. Finally, VDSL may also interfere with ADSL signals used on nearby wires. These issues are being examined.

**Summary:**  FTTC is an architecture that today, makes more economical sense as a stepping stone to a future FTTH deployment, due to the fact that most applications can be run easily over a FTTC solution. Several industry experts predict massive rollouts of this architecture to support convergence of voice, data, video and new services such as interactive video and videoconferencing. FTTC adds the flexibility to pick and chose which subscribers can be upgraded in the future.

# FTTH (Fiber to the Home)

**Approach:**  The idea of fiber to the home is not new. Telephone companies, cable TV companies, utilities and municipalities have all had their eye on FTTH. People from all over the industry have agreed that the ultimate future is FTTH because the passive nature of the network drives maintenance costs very low and the sheer bandwidth capability, over 10 Gbps, allows for virtually any imaginable service offering. This architecture has been held back by many factors, such as cost, imbedded investment in copper or coax and regulation, just to name a few. Over the past several years, the technical issues have been analyzed and trials have been held all over the world. Current economics of fiber have allowed for a reexamination of this architecture as a viable option in providing any and all services to the home.

**Description:**  Fiber extends from the CO or headend to a node in the field. Many existing architectures would already have the physical location of the node. From the node, fiber is split and extends to a closure where the fiber may be spliced or connectorized and sent off to each home. The major difference here is that the optical signal can travel the entire distance and be converted back to the electrical signal at the home. This reduces the need for electronics in the field to regenerate the optical signal or perform signal conversion, also resulting in a reduction in network powering requirements and number of enclosures.

**Advantages:**  The most significant advantage of FTTH is bandwidth, but other advantages of an all-fiber network include reliability, security and signal quality, just to name a few. Additionally, emerging optical technologies such as optical amplifiers and dense wavelength division multiplexing (DWDM) promise to further extend the capabilities of an all-optical network in new and exciting ways.

**Disadvantages:**  With optical-to-electronic and signal conversion necessary at every home, the initial cost of the network is larger than the rest. Additional costs are incurred by laying a new optical network when an existing copper network already exists, so it may make sense for the incumbents to utilize their existing network before considering a FTTH solution. Also, without copper, there is no way for the fiber to provide powering for the voice circuit. Lifeline power would need to be supplied from the subscriber through the use of batteries or some further developed technology.

**Summary:**  FTTH is an architecture that should be watched carefully. It currently makes more sense as a solution for a new build than an upgrade. Although the initial cost is relatively high, the higher reliability of a passive all-optical network can result in significant maintenance savings, making the life-cycle cost of



CORNING

WP6300
January 2001

FTTH one of the lowest of any of the architectures mentioned here.  And with fiber-rich system prices dropping, and with standards being set and bandwidth demand doubling every 18 months, a FTTH solution may be the correct answer.



Figure 3. *Installed first cost per home with respect to the take rate based on a high density neighborhood.*

## Overlay Network

**Approach:**  All network designers strive for an architecture that ensures all current and future services are planned for.  The Internet obviously is driving the data market to the forefront of current services, but video, voice and other future services, such as video on demand and videoconferencing, also should be built into the planned infrastructure.  This must be balanced with economics.  Labor is a large component of installation costs in North America, so if labor savings can be achieved by building a future-proof network now instead of upgrading later, such a network design should be seriously considered.  Another large cost component is the cost of electronics, especially in a FTTH network where these must be located at each home.

The overlay network focuses on reducing future labor costs and reducing the costs of electronics.  As with FTTH, this architecture is not widely deployed at this time.  Telephone companies, cable TV companies, utilities and municipalities all could install this network; however, we'll see that the logic behind this network leads toward new builds as opposed to upgrading existing networks.

**Description:**  The concept behind the overlay network is that all services are delivered in their native format, reducing the need for costly conversion electronics.  Fiber extends from the CO or headend to a node that services approximately 500 homes.  From the node, a triple media cable containing fiber, coax, and copper twisted pair extends to an amplifier point which serves approximately 100 homes.  From there, a triple media cable is dropped to tap points that extend to about eight homes.  The drop, the last link from the tap to the home, can be added when a subscriber signs up for the service.  With all three media



CORNING

WP6300
January 2001

terminated at the home, no cables will need burying in the future, reducing future labor costs associated with upgrades. Voice is provided over twisted pair, video is provided over coaxial cable and data is provided over fiber.

**Advantages:** With all three media available, this architecture allows for maximum flexibility and the upgrade path is built in. Issues encountered by traditional FTTH architectures—such as lifeline power—become inconsequential. Data can be delivered by a variety of means and is not tied to an electronics technology. Inexpensive data delivery solutions, such as Ethernet, can be put in now and may be even more inexpensive than providing data over copper media, such as ADSL. With the fiber in place, data delivery technology can be upgraded as it becomes technologically and economically feasible. Services from the other media can be migrated onto the fiber as appropriate, and need not be changed until the economics are right. And all this can be done without paying to dig up the ground again.

**Disadvantages:** Though this architecture is inexpensive and flexible, it is complex. Cable costs are higher, but although they are more than offset by the reduction in electronics, supporting three different types of media and many different electronics may be challenging. Operations and support costs also may be higher depending on how the different types of media are used.

**Summary:** Overall, the overlay architecture will allow network providers to grow their network how and when they want. Though perhaps not the most streamlined solution, it does provide a robust way to build tomorrow's network today for a reasonable cost. This approach is an innovative way to bring fiber to the home without the holdups that the conventional FTTH architecture has come up against.

## Conclusion

There is no single solution for every situation. Each of the architectures discussed has advantages that make it the right solution in certain applications. The appropriate choice for a network designer depends on many factors such as service offerings, media and electronics choices, and upgrade path to name just a few. Though in general, deeper fiber means higher installation costs, it also means lower maintenance and life-cycle costs, and higher reliability, bandwidth and security. Fiber is not always the most expensive solution, and can be the most inexpensive over the lifetime of the network. With careful planning for future upgrades and choices of service delivery media, fiber-to-the-home for data delivery can even be less expensive than copper.